IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| DAVID LEE FLEMING, | ) Civil Action No. 5:11-304-DCN-KDW |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) REPORT AND RECOMMENDATION |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claims for Disability Income Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further administrative action.

I. Relevant Background

A. Procedural History

Plaintiff protectively filed his SSI and DIB applications on December 12, 2006, alleging that his disability began on November 1, 2006 (the alleged onset of disability or "AOD"). Tr. 121, 125, 137. His applications were denied initially and upon reconsideration. Tr. 64, 66, 68, 70. At Plaintiff's request, an Administrative Law Judge ("ALJ") held a hearing on April 16, 2009, at which Plaintiff and a vocational expert ("VE") testified. Tr. 19.

The ALJ issued an unfavorable decision dated September 20, 2009. Tr. 9-18. The Appeals Council denied Plaintiff's request for review of that decision, Tr. 1, making it the final decision for purposes of judicial review. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on February 4, 2011. ECF No. 1.

## B. Plaintiff's Background and Medical History

### 1. Background

Plaintiff has at least a high school education and was thirty-nine years old on his AOD. Tr. 16–17. He has past relevant work ("PRW") as a "kitchen helper," clerk, and material handler. Tr. 46; *see also* Tr. 16.

### 2. Medical History[1]

On the night of October 31, 2006, Plaintiff arrived, via ambulance, at the Carolina Pines Regional Medical Center's emergency room ("ER"). Tr. 236. The car he had been driving was "T-boned" by a second vehicle, forcing the driver's side of Plaintiff's vehicle approximately 12 inches into the car's interior. Tr. 232. Computed tomography ("CT") scans showed numerous pelvic fractures; subluxation of the left femoral head in relation to the acetabulum; extensive hematoma around the left hip, within the pelvis and of the left psoas (groin) muscle; foreign debris in a soft tissue wound on the left buttock; a large paraesophageal hiatal hernia; a fracture of the transverse process on the left at the L2 level of the lumbar spine; a left pnuemothorax; anterolateral left rib fractures; a pulmonary contusion of the left lower lung; and a left pleural effusion. Tr. 251, 252, 256. Later examination would additionally show a splenic laceration. *See* Tr. 362. After an assessment of Plaintiff's

_____

[1] The undersigned has appended a glossary of selected medical terms for the reader's convenience.

injuries, he was transferred to McLeod Regional Medical Center ("McLeod Regional"). Tr. 236.

Plaintiff underwent numerous procedures while at McLeod Regional. His first surgery occurred soon after his arrival, for repair of his diaphragmatic hernia. *See* Tr. 362. Following that procedure, Plaintiff underwent insertion of a traction pin to maintain alignment of the acetabulum and pelvic fractures. Tr. 274; *see also* Tr. 362. Because Plaintiff was very unstable, his orthopedic injuries were not addressed until later, when the trauma surgical team cleared him. *See* Tr. 274.

Plaintiff's next procedure occurred on November 6, 2006, when surgeon Samuel G. Agnew, M.D. operated to address his complex hemipelvic fracture dissociation by open reduction internal fixation (ORIF) "via an extensile ilioinguinal approach." *See* Tr. 350. When he reported to the operating room, Plaintiff experienced a hypoxic episode, where his oxygen saturation dipped to only eighty-two percent on the face mask. Tr. 358. During the operation, Plaintiff's degloving injury was discovered, with "positive fluid wave to the thigh and deep ecchymosis" over an area of 28-by-20 centimeters along Plaintiff's torso and flank. *Id.* His pelvic fractures were found to be a left pelvic dissociation (parailiac fracture) "with concomitant both column variant injury to the left acetabulum"; a symphyseal fracture dislocation; and a right pubic root fracture. *Id.* In addition, the surgeon found that the obturator nerve had been impaled and was contused along approximately seven and one-quarter centimeters. *Id.*

On November 14, 2006, caregivers noted Plaintiff had increased swelling about his ilioinguinal incision. *See* Tr. 350. Because his postoperative course had been remarkable for "requiring continued ventilatory support and nutritional hyperalimentations," he underwent

other procedures before this swelling was addressed. *Id.* On November 15, 2006, surgeon Mark A. Reynolds, M.D. performed surgery on Plaintiff. Dr. Reynolds inserted a percutaneous endoscopic gastrostomy ("PEG") tube to treat Plaintiff's malnutrition. Tr. 353. Plaintiff also received a tracheostomy "for facilitation of ventilatory support" that day. Tr. 355.

Because a CT scan revealed "a large collection of fluid suggestive of a hematoma, and diastasis of [the] rectus muscle," Plaintiff presented for "surgical exploration" on November 16, 2006. Tr. 350. Dr. Agnew performed the surgery, which was done in connection with his left pelvic fracture dissociation, left associated pattern acetabular fracture, right anterior ring pelvis fracture dislocation, right acetabular fracture (anterior column), and wound dehiscence. Tr. 350-51. Dr. Agnew debrided Plaintiff's skin, subcutaneous tissues and bone along the entire ilioinguinal incision and applied a "bioclusive antibiotic delivery system" and a GranuFoam and VersaForm wound VAC system. *Id.* The surgeon discovered infection of his ilioinguinal incision, which was added to his known infections of the lung involving ORSA (oxacillin-resistant staphylococcal aureus), infection of his blood involving Kiebsiella, a yeast infection in his urine, and continuing myoglobinuria. *Id.*

Plaintiff returned for additional surgery on November 20, 2006, because of wound dehiscence to the entire Pfannenstiel incision; facial defects to the anterior abdominal wall (retroperitoneal, pelvis) and left external abdominal oblique; and a polymicrobial wound infection to the incision. Tr. 293. Dr. Agnew performed repeat irrigation and debridement of the skin, subcutaneous tissues, and bone; applied a bioabsorbable antibiotic delivery system

and another wound VAC system (large); and delayed primary closure (complex) of 32 centimeters. *Id.*

Plaintiff returned to surgery on November 27, 2006, due to "persistent and consistent discharge from his wound." Tr. 343. He remained in the intensive care unit, and still required ventilatory support. Dr. Agnew removed a subcutaneous seroma of some 500 cubic centimeters. He performed debridement and irrigation of subcutaneous tissue, fascia, muscle, the pubic root and the retropubic space. *Id.* Dr. Agnew discovered that there was a large degloving plane still present, with manual palpation possible to the T12 level. He debrided and irrigated this area, as well as Plaintiff's entire psoas to the T11 level. Tr. 343-44. Dr. Agnew set in place numerous drains and an irrigation suction system. Tr. 344.

Ten days later, on December 7, 2006, Plaintiff again underwent surgery. Dr. Agnew wrote that Plaintiff "continue[d] to demonstrate problems associated with his extended ilioinguinal incision due to hydrostatic pressure from repeat (times 4) accumulation of subcutaneous fluid, causing secondary wound necrosis." Tr. 340. Intraoperatively, the doctor found 750-to-1000 cubic centimeters of peritoneal fluid in Plaintiff's wound, and "[c]omplete disruption" of the internal iliac fossa fascial repair. *Id.* Dr. Agnew excised the entire surgical site; debrided the skin, subcutaneous tissue, and bone; and irrigated the area. Tr. 341. He performed the same procedure on the extended ileofemoral incision-abdominal wall, and placed a drainage tube. *Id.*

Plaintiff remained in the hospital, and on December 26, 2006, he underwent additional surgery. Plaintiff had experienced prolonged flexion of his hip and required a capsulotomy to return it to its regular uncontracted state. Tr. 275. Dr. Agnew explained that Plaintiff developed a recalcitrant posture to his left hip secondary to a Class III heterotopic

ossification. Tr. 337. The surgeon performed excisional debridement of Plaintiff's entire surgical tract, through to the gluteus medius pillar, and down to the heterotopic bone and internal iliac fossa. Tr. 338. Dr. Agnew uncovered and resected "an extensive amount of bone encompassing the entire internal iliac fossa." *Id.* This, in turn, revealed "marked clinical incongruity at the medial wall of [the] acetabulum that was not identified" previously. *Id.* Dr. Agnew also found that he had to resect the ilioinguinal ligament, iliopectineal fascia remnant, and iliopsoas. He performed a T-capsulotomy so that the psoas tendon was released from the proximal femur. *Id.*

Plaintiff was discharged from McLeod Regional on January 9, 2007. His discharge summary indicates that, during his hospitalization, he had to be hemodynamically stabilized by multiple packed red blood cell transfusions. Tr. 275. It also notes Plaintiff's two chest tubes related to his diaphragmatic hernia, *id.*; postoperatively, Plaintiff had suffered respiratory failure and rhabdomyolysis, Tr. 325. A later hospital record adds that Plaintiff developed a bladder perforation, which was repaired. Tr. 519. Plaintiff had seen both physical and occupational therapy to address his deconditioning. Tr. 275.

The discharge summary describes Plaintiff's "several bouts of infections" that had been treated with "a rainbow spectrum of antibiotics," and involved a consultation with the Infectious Disease department. *Id.* Upon discharge, Plaintiff still had a yeast infection in his groin area, and a urinary tract infection. He was leaving the hospital with a "small seroma type area on his left hip," which would require daily dressing changes. *Id.* Plaintiff was to receive continuing physical therapy ("PT"), beginning on February 5, 2007. Tr. 757.

Plaintiff saw Dr. Agnew at McLeod Orthopedic Trauma Associates ("McLeod Ortho") for his first post-discharge visit on January 23, 2007. Tr. 297. Dr. Agnew observed

that Plaintiff had reduced hip range of motion; decreased sensation along the L4-to-L5 nerve root and to his lumbosacral plexus; and decreased function to his EHL, EDC, and peroneal groups. *Id.* Dr. Agnew explained that Plaintiff would require additional heterotopic ossification resection. *Id.*

When Plaintiff returned to McLeod Ortho for a scheduled return visit on February 20, 2007, his incision was coming open and was oozing. Tr. 774. He was readmitted to McLeod Regional that day and remained there until March 7, 2007. *See* Tr. 370-71. Notes indicated he was admitted with osteomyelitis involving the left ileum and superior pubic area, and a large subcutaneous abscess. Tr. 370. On the following day, Plaintiff underwent another irrigation and debridement of the left hip and symphysis pubic area. J. Gregory Kinnett, M.D. performed the surgery, removing hardware from his hip and applying a wound vac. *See* Tr. 370. Two days later, Plaintiff had another irrigation and debridement and repack with wound vac. *Id.*

On February 28, 2007, Plaintiff had another irrigation and debridement, with excision and debridement of skin, subcutaneous tissue and bone, and the creation of a fasciocutaneous flap over the "peri-iliac and epigastric based on fascial planes." *Id.* This surgery revealed extensive ossification and calcification of the psoas, iliopsoas and true pelvis, and in the rectus. Tr. 389. Again, on March 3, 2007, Plaintiff underwent irrigation and debridement, with coverage of his soft tissue defect via fasciocutaneous flaps (previously elevated), Z-plasty re-approximation of the cephalad limb, and application of a wound vac system. Tr. 370.

While hospitalized, Plaintiff received treatment with a variety of antibiotics. Surgical notes indicate that, during his treatments, Plaintiff developed Staphylococcus ("ORSA"),

Tr. 386, which continued, Tr. 392.  Later hospital records identify the infection as "MRSA," methicillin resistant Staphylococcus aureus.  *See* Tr. 797, 804.  While an outpatient, the "flexion abduction external rotation posture to [Plaintiff's] left leg," which had been corrected by the capsulectomy and resection, returned. Tr. 386.  Plaintiff was again discharged home on March 7, 2007.  Tr. 370.

When Plaintiff had follow-up at McLeod Ortho on March 12, 2007, his incision site was still draining.  Tr. 773.  He returned on March 21, Tr. 772, and April 2, 2007, Tr. 769, when three areas of dehiscence were found, Tr. 769. Plaintiff was readmitted to McLeod Regional on April 2, 2007. Tr. 522.

On April 4, 2007, Plaintiff underwent an elliptical excision of a large draining sinus and the left ileac area; radical debridement of a necrotic area in the left ileum; reconstruction of the anterior abdominal wall due to concern over bladder wall breach; and irrigation and debridement.  Tr. 519; *see also* Tr. 535.  Cultures revealed ORSA, and Plaintiff was started on antibiotics.  Tr. 519.  Plaintiff also developed a urinary tract infection.  On April 12, 2007, Plaintiff had a "PICC" line inserted. Tr. 712.  With plans to receive intravenous antibiotics twice daily for ten days for his ORSA infection, Plaintiff was discharged, Tr. 519.

On April 19, 2007, Plaintiff saw Dr. Harriett Steinert for a Social Security Examination Comprehensive Medical Exam. Tr. 642-43. Dr. Steinert summarized Plaintiff's injuries and surgical procedures, and observed that Plaintiff was walking with a walker. Tr. 642. Her examination revealed decreased range of motion of Plaintiff's left hip, and sensory deficits in his left leg. Tr. 643. Dr. Steinert assessed that Plaintiff's left leg motor function had decreased to three on a five-point scale. *Id.* She noted that Plaintiff walked on his toes, and thought it might be due to left leg-shortening. *Id.* She noted it was difficult to

evaluate because of Plaintiff's left hip pain. *Id.* Dr. Steinert found equal and normal deep tendon reflexes and peripheral pulses in all of Plaintiff's extremities. *Id.* Dr. Steinert observed that Plaintiff could walk across the room using his walker, but with a very unsteady gait; he could not walk on his heels and toes. *Id.* She concluded that he could not work at all, noting the following: Plaintiff could not walk without a walker; he could not sit for long due to exhaustion; and he was still on intravenous antibiotics. *Id.*

X-rays taken on April 19, 2007 showed mild degenerative changes of the lower lumbar spine, and extensive post-traumatic bony abnormalities of the pelvis. Tr. 633. The set taken of Plaintiff's left side detailed changes of avascular necrosis with subchondral cyst formation, loss of joint space, sclerosis, some collapse of the femoral head, and degenerative changes of the hip joint. Tr. 637. X-rays targeting the pelvis revealed very extensive posttraumatic changes and extensive heterotopic bone formation, and displaced, non-healed fractures of the inferior pubic ramus on the right. Tr. 639.

On May 1, 2007, state agency medical consultant ("MC") Dale Van Slooten performed a physical residual functional capacity ("RFC") assessment based on a review of Plaintiff's records. Tr. 646-53. MC Van Slooten concluded that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk at least two hours in an eight-hour work day, and sit about six hours in an eight-hour work day. Tr. 647. He found Plaintiff to be able to operate foot controls with his left foot on only a "frequent" basis. *Id.* MC Van Slooten limited Plaintiff's postural movements to "occasionally," except for a finding that Plaintiff should never climb ladder, ropes or scaffolds. Tr. 648. Citing Dr. Steinert's report and the April 2007 x-rays, he projected that

Plaintiff would be able to perform light/sedentary work within twelve months of his AOD. Tr. 647-48, 652.

State agency psychological consultant ("PC") Samuel Goots reviewed Plaintiff's records and completed a Psychiatric Review Technique form concerning Plaintiff on May 2, 2007. Tr. 656-69. MC Goots opined that Plaintiff had a "medically determinable impairment" that did not satisfy the Administration's diagnostic criteria for depression, and that this impairment was not severe. Tr. 656, 659.

When Plaintiff returned to McLeod Ortho for follow-up on May 2, 2007, he was "doing very well" with "no complaints," no drainage from his incision. Tr. 674. Plaintiff indicated he had chronic pain in his left lower extremity. *Id.* He was instructed to continue PT and return seven-to-ten days later to have remaining sutures removed. *Id.*. Plaintiff returned on May 14 and 25, 2007, received prescriptions, and was told to return in July. Tr. 765, 767.

On July 25, 2007, after having reviewed Plaintiff's medical records, state agency consultant MC James Weston completed a physical RFC assessment Tr. 682-89. He noted that Plaintiff was then "home and stable, wounds healing, ambulatory, with further improvement expected, though some permanent impairment is also expected." Tr. 683. MC Weston opined that, 12 months after his AOD,[2] Plaintiff would be able to occasionally lift and/or carry ten pounds, frequently lift and/or carry ten pounds, stand and/or walk at least two hours in an eight-hour work day and sit about six hours in an eight-hour work day. Tr. 682-83. MC Weston limited Plaintiff's ability to push/pull in his lower extremities. Tr. 683.

---

[2] MC Weston provided his assessment on June 25, 2007. Tr. 689. The assessment form indicates the opinion is offered as of November 11, 2007, which would be 12 months after Plaintiff's AOD. Tr. 682.

MC Weston found Plaintiff could never climb, balance, kneel, crouch, or crawl; he opined Plaintiff could occasionally kneel and frequently balance. Tr. 684.

Plaintiff was again admitted to McLeod Regional on August 3, 2007. *See* Tr. 804-06. Upon admission, it was noted that Plaintiff had been "doing pretty good," having progressed from being bedridden to being able to use crutches. Tr. 804. Notes indicate that three weeks prior to the August 3, 2007 admission, Plaintiff had begun having night sweats, had increasing pain, and had developed a rash that had worsened the preceding day. *Id.* Two weeks prior to admission, Plaintiff had dark urine, was anorexic and ultimately bedridden, with severe pain in his left hip down into his knee. *Id.* Plaintiff had been seen ten days prior and had an MRI of his knee taken, which the ER caregiver read as indicating edema. *Id.* Upon presentation to the ER, Plaintiff was febrile and tachycardic. Tr. 804. The Infectious Disease and Orthopedic Departments were consulted. Tr. 806.

Raymond Imatani, M.D. of McLeod Ortho, treated Plaintiff orthopedically during the August 2007 hospital stay. Dr. Imatani noted that CT scans showed a collection of fluid in or about the left femoral head. Tr. 716. Plaintiff underwent CT-guided aspiration of the left hip on August 5, 2007, which indicated Staphylococcus aureus. A drainage catheter was placed, and Plaintiff was put on antibiotics, which were to continue for several weeks. *Id.* Plaintiff also suffered from osteomyelitis in the left pelvic region. *Id.*

The CT scan and a nuclear medicine bone scan revealed advanced osteoarthritis of the left hip and that collapse of the left femoral head had progressed since an April 3, 2007 CT. Tr. 718. A nonunited comminuted fracture of the left iliac wing, extending through the superior aspect of the acetabulum, was also evident. X-rays of Plaintiff's pelvis showed that

the left acetabulum was deformed, with marked loss of joint space and some flattening of the left femoral head, and extensive heterotopic ossification. Tr. 719.

Plaintiff had a CT scan of his chest after he developed chest pain, shortness of breath, and an elevated D-Dimer. Tr. 798. The scan revealed pulmonary emboli on the left, and iron studies indicated iron-deficiency anemia. Tr. 800. Cultures of his blood showed that Plaintiff had a blood stream infection, in addition to a wound infection. Tr. 800-01.

The report from Internal Primary Medicine gives a final discharge date of August 15, 2007, and lists diagnoses of recurrent staphylococcus pelvic abscess, oxacillin sensitive staphylococcus bacteremia, pulmonary embolus, and anemia. Tr. 797. Plaintiff was to receive intravenous antibiotics daily for a total of 42 days. Tr. 799.

On September 16, 2007, Dr. Imatani referred Plaintiff for PT; he repeated this referral on October 16, November 16, December 16, and January 16, 2008. Tr. 721-25. Plaintiff went to see Dr. Imatani on September 27, with diffuse left hip and knee pain. Tr. 763. He told the doctor that "at one point he could walk with a cane but now, he needs crutches." *Id.* McLeod Ortho's records show regular medication refills from October 24, 2007, through May 1, 2008. *See* Tr. 722-24, 732-38.

Plaintiff next saw Dr. Imatani on June 11, 2008, for continuing severe pelvic and hip pain. Tr. 762. Plaintiff told Dr. Imatani that he continued to have difficulty with mobilization: he could take only three steps without an assistive aid and, beyond that, he had to use crutches or a wheelchair. He used the wheelchair when "out for long visits." *Id.* Dr. Imatani's examination revealed a ten-degree flexion contracture of the knee, and a ten-degree plantarflexion contracture of the ankle. He saw that Plaintiff was able to bear weight with toe-touch on the left and that he walked with a limp. Plaintiff demonstrated very limited

internal and external rotation of his hip and abnormal dysesthesias in his lower extremities. Dr. Imatani read x-rays to reveal significant bone irregularity in Plaintiff's left hip region, with osteolysis and "significant" arthritis present. *Id.*

The next medical records are dated February 17, 2009, when Plaintiff saw Brian Hanna, M.D. with complaints of chronic pelvic pain and neuropathy. Tr. 819-20. Dr. Hanna referred Plaintiff to FirstChoice Healthcare ("FirstChoice") for pain management. On March 2, 2009, Plaintiff saw FirstChoice's Dr. George Bitting, complaining of left knee and hip pain of eight on a ten-point scale. Tr. 785. Plaintiff said his pain was continuous, although it waxed and waned. His pain medications improved his activity level, enabled him to do more, and caused no side effects. *Id.* However, Plaintiff's pain caused insomnia and decreased his quality of life. *Id.*

Dr. Bitting noted that Plaintiff had failed PT. He diagnosed Plaintiff with paresthesia and chronic pain, prescribed medications, and scheduled him for a nerve conduction/electromyogram study. Tr. 786-87. The study indicated left sensory and motor neuropathy, and left radiculopathy. Tr. 808.

Plaintiff's medical records indicate he saw Dr. Hanna again on March 18, 2009, in follow-up for chronic problems. Tr. 817. Plaintiff regularly went to FirstChoice from March 23, 2009, through September 28, 2009, for medication reviews, prescription refills, and nerve blocks. *See* Tr. 788-89, 823-45. Plaintiff's diagnoses included neuralgia, neuropathy, paresthesia, causalgia, muscle spasm, and chronic pain. *See id.*

C. The Administrative Hearing

At the April 16, 2009 administrative hearing, Plaintiff appeared with his attorney and testified. According to his testimony, Plaintiff drove an average of five days a week because

13

he took his autistic-bipolar son to and from school. Tr. 27. He said he also ran errands when he was out. Tr. 28. Plaintiff indicated he took care of his nine-month-old grandson once or twice a week, but it "really [took] a lot out of" him. Tr. 38-39. He said his fiancée was always in the home with him. Tr. 45.

Plaintiff said he could take care of his personal hygiene without help. Tr. 28. He could heat a meal in the microwave or make sandwiches, but could not stand long because he stood on only one foot. He indicated his fiancée did the housework. Tr. 29.

Plaintiff explained that he had a gap in his medical treatment because he was uninsured from the time of the accident through February 2009, when he began receiving Medicaid. Tr. 34-35. He testified that he had extra pain medication and parceled it out through the period he was uninsured, taking it only when he had to, and otherwise "lived with the pain." Tr. 35-36. Plaintiff indicated his doctors had told him he needed a new hip, but they would not replace his hip because of his relative youth and his previous MRSA infections. Tr. 35.

Plaintiff did not think he would be able to work because his prescriptions were going to get stronger and they would make him groggy. Tr. 36. He had pain sitting down and standing up, and could only stand on one foot, and then for just a few minutes. *Id.* If he was sitting in the same chair continuously he would have pain. *Id.* At home, Plaintiff alternated from a desk chair to a recliner to standing up. Tr. 43. If he did something strenuous or if the pain was bad enough, he had to lie down. The pain caused difficulty with sleeping. Tr. 40.

Plaintiff testified that his medications caused "lightheadedness," and, when he was fully medicated, he was "just there." Tr. 38. He said he would usually lie down once-or-twice a day, for thirty minutes to an hour. He could sit for fifteen-to-ninety minutes at a

time, stand for about five minutes at a time, and walk with crutches for about ten minutes at a time. Tr. 38-39.

In response to the ALJ's questions, the VE testified that Plaintiff's PRW was kitchen worker, unskilled, medium; material handler, semi-skilled, heavy; and industrial cleaner, unskilled, medium. Tr. 46. The ALJ had the VE base his testimony on a hypothetical claimant who was Plaintiff's approximate age and with his approximate education and PRW, who could not lift and carry over ten pounds occasionally and ten pounds frequently; would not be able to stand or walk over two hours in an eight-hour workday; would be able to do no more than occasional stooping and no more than frequent balancing; would not be able to crouch, kneel, climb stairs or ramps, crawl, or climb ladders, ropes or scaffolds; and would not be able to use the left lower extremity for foot pedals or other controls more than occasionally. Tr. 46. In response, the VE testified that the individual would not be able to perform Plaintiff's PRW, but could perform other work that exists in significant numbers in the national economy, including food order clerk, assembler and quality control examiner. Tr. 46-47. If that person sat for an hour, then got up to stretch and sat back down, his answer remained the same. Tr. 48.

## II. Discussion

### A. The ALJ's Findings

In his September 29, 2009 decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.

2. The claimant has not engaged in substantial gainful activity since November 1, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the following severe impairments:   status-post motor vehicle accident with traumatic injuries including fractured pelvis, ribs and L5 right transverse process; avascular necrosis and vascular arthritis of the left hip; osteoarthritis, and osteomyelitis (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift and carry up to 20 pounds occasionally and 10 pounds frequently; to stand and/or walk up to 2 hours in an eight-hour workday; with a sit/stand option at one hour; with occasional stooping, crouching, kneeling, and climbing of stairs or ramps; with no crawling; with no climbing of ladders, ropes, or scaffolds; with frequent balancing; and with only occasional foot pedals or other controls with the left lower extremity.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on May 24, 1967, and was 39 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from November 1, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 11-18.

B.  Legal Framework

1. The Commissioner's Determination-of-Disability Process

The Social Security Act (the "Act') provides that DIB shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in the Act as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than" twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).[3]

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the "Listing of Impairments" found at 20 C.F.R. part 404, subpart P, appendix 1;[4] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as

[3] The regulations applying these sections are contained in different parts of Title 20 of the Code of Federal Regulations (C.F.R.). Part 404 applies to federal old-age, survivors, and disability insurance, and part 416 applies to supplemental security income for the aged, blind, and disabled. As the relevant portions of the two sets of regulations are identical, the citations in this Report will be limited to those found in part 404. All of this court's regulatory references are to the 2009 version of the C.F.R.
[4] Although the Listings are contained only in part 404, they are incorporated by reference into part 416 by 20 C.F.R. § 416.925.

the "five steps" of the Commissioner's sequential evaluation process. If a decision regarding disability may be made at any step, no further inquiry is necessary. *Id.* § 404.1520(a)(4) (providing that if the Commissioner can find claimant disabled or not disabled at a step, the Commissioner makes the determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See id.* § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62, *reprinted in West's Social Security Reporting Service: Rulings 1975-1982*, at 809 (West Publ'g Co. 1983). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. *Hancock v. Astrue*, 667 F.3d 470, 472–73 (4th Cir. 2012). To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that the claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The

scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)).

The court's function is not to "try [these cases] de novo, or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157 (4th Cir. 1971); *see also Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C. Analysis

Plaintiff argues that the ALJ erred in the following ways: (1) by failing to perform the listing analysis at step three; (2) by improperly evaluating Plaintiff's credibility; and (3) by improperly assessing his RFC. The Commissioner counters that the ALJ's decision is supported by substantial evidence and contains no harmful legal error.

## 1. The Listings

Plaintiff contends that the ALJ erred at step three of the sequential evaluation process because he failed to analyze whether Plaintiff met Listing 1.02. The "Listings," found at 20 C.F.R. part 404, subpart P, appendix 1, "is a catalog of various disabilities, which are defined by 'specific medical signs, symptoms, or laboratory test results.'" *Bennett v. Sullivan*, 917 F.2d 157, 160 (4th Cir. 1990) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). When a claimant satisfies a listing by meeting all its specified medical criteria, he presumably qualifies for benefits. *See Bennett*, 917 F.2d at 160. At step three, the ALJ should first identify the relevant listed impairment(s), and then should compare each of the listed criteria to the evidence of the claimant's symptoms. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).

In the instant case, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the [Listings.]" Tr. 11. However, the decision contains no discussion of any of the Listings. The Commissioner concedes that the ALJ provided no more than a summary conclusion regarding whether Plaintiff met or medically equaled one of the listed impairments. Def.'s Br. 7. However, the Commissioner defends the ALJ's decision by citing a Tenth Circuit case for the proposition that such failure is harmless error because "an ALJ's findings at other steps of the sequential process may provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment." *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005), (as quoted in Def.'s Br. at 7). The Commissioner offers no discussion in support of this argument, however. The court agrees with Plaintiff that the

ALJ's failure to discuss relevant Listings and consider Plaintiff's symptoms in light of the Listing(s) requires remand. *See Cook*, 783 F.2d at 1173.

Specifically, Plaintiff contends that the ALJ erred in failing to match the evidence to the criteria in Listing 1.02, which specifies the requirements for finding that a major dysfunction of a joint can constitute a disability. *See* 20 C.F.R., pt. 404, subpt. P, app. 1, 1.02. The joint dysfunction must satisfy the following:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> > A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
> >
> > or
> >
> > B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

*Id.*

Plaintiff has presented medical evidence of a "gross anatomical deformity" in Dr. Imatani's June 2008 records, which contain findings of a ten percent flexion contracture of Plaintiff's left knee and a ten percent "plantarflexion contracture of ankle that cannot come in neutral." Tr. 762. Dr. Imatani explained that pelvis x-rays revealed "significant bone irregularity, with osteolysis and arthritis, and left hip x-rays showed "significant posttraumatic arthritis." *Id.* Earlier studies had demonstrated that the left acetabulum was deformed, with marked loss of joint space, flattening of the left femoral head, and extensive heterotopic ossification. Tr. 719. Upon physical examination, Plaintiff's hip had "very

limited internal and external rotation." Tr. 762. His medical records support a finding of chronic joint difficulties as evidenced by his steady receipt of prescriptions for Lortab[5] and Flexeril,[6] *see, e.g.*, Tr. 729-38, 786, 829, and nerve blocks, *see* Tr. 839, 823.

As to Plaintiff's "inability to ambulate effectively,"[7] he explained to Dr. Imatani that he had difficulty with mobilization; he could take only three steps without using an assistive device, and beyond that, had to use crutches or a wheelchair. Tr. 762. The doctor observed that Plaintiff "toe-touch weightbears on the left and walks with a limp." *Id.* After Plaintiff's receipt of Medicaid, *see* Tr. 35, he was able to establish a medical relationship for pain management, which reported Plaintiff's "[u]nphysiologic gait" and "generally reduced" mobility and range of motion. Tr. 824.

---

[5] "Lortab" contains hydrocodone, which "is the generic name for a common, widely distributed, opioid narcotic analgesic." *United States v. Brown*, 553 F.3d 768, 774 n.1 (5th Cir. 2008).

[6] "Flexeril is prescribed to relieve skeletal muscle spasms associated with acute, painful musculoskeletal conditions." *Tilley v. Astrue*, 580 F.3d 675, 678 n.5 (8th Cir. 2009) (citing *Physicians' Desk Reference* 1832-33 (60th ed.2006)).

[7] The introductory comments to the Musculoskeletal Listings provide guidance for defining this phrase:

> Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

20 C.F.R., pt. 404, subpt. P, app. 1, 1.00B2b(1). The Commissioner has explained that this description "make[s] it clear that this applies to anyone who cannot walk adequately. The explanation is intended to mean that individuals who can only walk with the aid of hand-held assistive devices requiring the use of both upper extremities would meet the definition of inability to ambulate effectively." "Revised Medical Criteria for Determination of Disability, Musculoskeletal System and Related Criteria," 66 Fed. Reg. 58,010-01, 58,027 (Nov. 19, 2001).

In his decision, the ALJ purportedly relied upon the conclusions of the state agency consultants, whom he said found that, "less than a year after his [AOD], the claimant was capable of a range of sedentary work." Tr. 13. This, however, is not the conclusion of the state agency experts. On May 1, 2007, MC Van Slooten speculated that Plaintiff would be able to perform light-to-sedentary work by November 2007 "with continued treatment and healing." Tr. 652. On July 25, 2007, MC Weston noted that Plaintiff was then "home and stable, wounds healing, ambulatory, with further improvement expected," in opining that Plaintiff would be able to perform a limited range of sedentary work. Tr. 683. However, the record indicates that, just after the time of MC Weston's opinion, Plaintiff began having "night sweats with increasing pain," developed a rash, and became anorexic and bedridden. He was re-hospitalized on August 3, 2007, and received additional antibiotic treatment. *See* Tr. 797-99 (Aug. 15, 2007 discharge notes from McLeod Regional indicating Plaintiff began having these symptoms approximately three weeks prior to his Aug. 3, 2007 admission date). Thereafter, Plaintiff underwent, and failed, PT. *See* Tr. 721–25; 785.

Although the ALJ discussed Plaintiff's medical records following the August 2007 hospitalization through March 2009, the undersigned notes the record includes no opinion evidence that covers the period between MC Weston's July 25, 2007 opinion and the ALJ's September 29, 2009 decision. As cautioned by the Seventh Circuit's Judge Posner,

> But judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor . . . . The medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them. Common sense can mislead; lay intuitions about medical phenomena are often wrong.

*Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990), *cited in Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003); *see also Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007)

(holding, "[A]n ALJ cannot play the role of doctor and interpret medical evidence."); *Manso-Pizarro v. Sec'y of Health & Human Servs.*,76 F.3d 15, 17 (1st Cir. 1996) ("[A]n ALJ, as a lay person, is not qualified to interpret raw data in a medical record.").  Because the ALJ failed to conduct the proper Listings analysis, and substantial evidence does not exist elsewhere in his decision to support his step three finding, the court should remand for further action in accordance with this Report.[8]

It is evident that the ALJ believes that Plaintiff retains sufficient RFC to engage in substantial gainful activity.  The significance in finding that a claimant meets a Listing is that the sequential evaluation never proceeds to an RFC assessment:

> The [Commissioner] explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard.  The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just "substantial gainful activity."  . . .  The reason for this difference between the listings' level of severity and the statutory standard is that, for adults, *the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary.*  That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work.

*Sullivan v. Zebley*, 493 U.S. at 532 (emphasis added).  As Plaintiff presented enough evidence for the ALJ's consideration, and this evidence is dated after the state agency's consideration, this case should be remanded for the ALJ to analyze Plaintiff's impairments under Listing 1.02.

---

[8] The ALJ based his decision, in part, on Plaintiff's lack of medical records between September 2007 and June 2008.  *See* Tr. 15-16.  Plaintiff alleges that he indeed was undergoing treatment.  *See* Tr. 33, 52.  Although the primary responsibility for establishing a prima facie entitlement to benefits lies with the claimant, *see Yuckert*, 482 U.S. at 146; *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981), the regulations provide that the Administration will "help you get medical reports from your own medical sources," 20 C.F.R. § 404.1512(d).  The regulations further provide that a party may request a subpoena from the ALJ for the production of records.  20 C.F.R. § 404.950(d)(1).

### 2. Credibility

Plaintiff next complains that the ALJ erred in how he conducted the credibility assessment. In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), the Fourth Circuit Court of Appeals set out its standard governing the assessment of subjective complaints:

> Once an underlying physical or ental (sic) impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability. Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered. Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

*Id.* at 564–65 (quoting SSR 90-1p, 55 Fed. Reg. 31898-02) (emphasis omitted). The Court added that SSR 96-7p, 20 C.F.R. § 416.929(c)(1) and (c)(2), *Hunter v. Sullivan*, 993 F.2d 31, 36 (4th Cir.1992), and other successors to SSR 90-1p "establish a two step process that comports with applicable Fourth Circuit precedent." *Hines*, 453 F.3d at 565. According to the regulation,

> [1] When the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain, [2] we must then evaluate the intensity and persistence of your symptoms so that we can determine how your symptoms limit your capacity for work.

20 C.F.R. § 404.1529(c)(1).[9] The ALJ found that Plaintiff did have medically determinable impairments which could reasonably be expected to cause "some" of his alleged symptoms, but that his "allegations concerning his impairments, symptoms and the ability to work are not substantiated by the total evidence of record and are partially credible." Tr. 13.

---

[9] 20 C.F.R. § 404.1529 is the DIB corollary to 20 C.F.R. § 416.929.

Plaintiff disputes the ALJ's credibility finding, specifically complaining that the ALJ improperly rejected Plaintiff's representations that he needed a crutch to ambulate and that he experienced disabling pain. Upon consultation with Dr. Bitting for pain management, Plaintiff reported that his pain was continuous, although it waxed and waned, and was worse with activity. Tr. 785. This is consistent with his testimony that, whether he stood or sat in one chair or another, he had pain "in one spot or the other." Tr. 36. If he visited with his grandchild or did "something strenuous," and the pain got "bad enough," he would lie down. *Id.*

As to Plaintiff's need for assistive devices, he told Dr. Imatani that he had difficulty with mobilization, being able to take only three steps unassisted, and then having to use crutches or a wheelchair. Tr. 762. Dr. Imatani noted that Plaintiff "toe-touch weightbear[ed]" and walked with a limp. *Id.* This is consistent with Plaintiff's testimony that, if he stands without crutches, he does so on his right foot, and only for a few minutes. Tr. 28. If he goes shopping, he must use either the crutches or a motorized cart. Tr. 29, 39. These representations, in turn, are consistent with medical evidence of joint contracture, advanced osteoarthritis, collapse of the left femoral head, a deformed left acetabulum with marked loss of joint space and some flattening of the left femoral head, and extensive heterotopic ossification. Tr. 718-19, 762. *See* SSR 96-7p, 61 Fed. Reg. 34,483-01, 34,486 (a strong indication of credibility is the consistency, both internally and with other information in the case record, of the claimant's statements).

In counter to this evidence, the ALJ explained that Plaintiff "betrayed no evidence of any significant discomfort while testifying at the hearing," although he conceded that "the hearing was short-lived and cannot be considered a conclusive indicator of the claimant's

overall level of functioning." Tr. 13. Plaintiff, in turn, points to statements during the hearing that he was "standing on one foot now," Tr. 37, and "I stood up a few minutes ago, but already my hip is already kicking me in the side," Tr. 42. Further, when asked by the ALJ, "Where is the pain when you're sitting?," Plaintiff answered, "[T]he one I have right now is from probably about four inches on my waist to about two inches on my back in a straight line." Tr. 43. The ALJ also considered the findings of the state agency consultants, Tr. 13, but, as discussed above, they are not consistent with the objective medical evidence after the date they were offered.

The ALJ additionally relied upon the "two significant gaps in the medical evidence in which the claimant did not seek treatment." Tr. 14. The ALJ acknowledged,

> At the hearing, the claimant indicated that he did not have insurance or money to see any of his doctors during this time. However, the record does not show that he had to have urgent care during this period, or that he requested information about any Free Clinics or reduced-fee medical care.

*Id.*

The ALJ may properly rely upon the failure to seek treatment as an indicator that the claimant's symptoms were not a source of distress. *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005) (noting failure to seek treatment constitutes a reason for discounting subjective claims). But in so doing, the ALJ failed to consider following admonition:

> [T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

SSR 96-7p, 61 Fed. Reg. at 34,487.

In fact, SSR 96-7p suggests that the claimant's explanation "may provide insight into the individual's credibility," such as "[t]he individual may have been advised by a medical source that there is no further, effective treatment that can be prescribed and undertaken that would benefit the individual." *Id.* Indeed, Dr. Imatani assessed that Plaintiff was in "a most difficult situation," explaining that Plaintiff "may never be a candidate for a total hip replacement because of infection. Repeat [irrigation and debridement] will be of limited help. It is possible that more surgery in the future will not be beneficial. The hardware removal would be an extensive process with significant risk of complications." Tr. 763.

Dr. Imatani wished to refer Plaintiff to a "tertiary center," but acknowledged that it would be difficult "[f]or economic reasons." *Id.* Plaintiff testified that, throughout his medical treatment, until February 2009, he had no medical insurance. Tr. 34. "So Dr. Agnew's office just dropped me out of nowhere saying there was nothing else they could do for me," although Plaintiff suspected it was because he was not paying the McLeod Ortho. *Id.* He believed that PT "dropped" him because he was not paying the hospital. *Id.* In June 2008, McLeod Ortho recommended pain management, but Plaintiff testified that pain management "said I needed the money up front before I could ever be seen." Tr. 34–35.

In the Fourth Circuit, "[a] claimant may not be penalized for failing to seek treatment she cannot afford; '[i]t flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him.'" *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986) (second alteration in original) (quoting *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984)). As in *Lovejoy*,

the undersigned acknowledges that the ALJ may not have denied Plaintiff benefits on the basis of noncompliance,[10] but

> [I]t is as erroneous to consider the claimant's failure to seek treatment as a factor in the determination that her impairment is not severe as it would be to reach the ultimate conclusion that the claimant is not disabled because she failed to follow prescribed treatment when that failure is justified by lack of funds.

790 F.2d at 1117.

It is noteworthy that, as soon as Plaintiff became a Medicaid recipient, he sought medical treatment. *See* Tr. 35. He saw his general practitioner in February 2009 and got a referral for pain management treatment. Tr. 819-20. Plaintiff went for pain management treatment on March 2, Tr. 785; had neurodiagnostic testing on March 12, Tr. 808; returned to his general practitioner on March 18, Tr. 817; and then reported for pain management ten more times in the next six months.[11] Tr. 789, 823-41.

The ALJ further cited to Plaintiff's activities, which he admitted were "limited," but found them "mostly consistent" with a sedentary RFC. Tr. 13. The ALJ listed those activities as driving his son back and forth to school, driving to perform errands, ability to perform personal hygiene, and preparing meals. Tr. 12-13. Plaintiff explained, however, that he usually did his errands while he was ferrying his son, Tr. 28, and went to Wal-Mart

---

[10] The regulations state that, "[i]n order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work." 20 C.F.R. § 404.1530(a). But SSR 82-59 provides that, in order to utilize this regulation, the Commissioner must first satisfy certain conditions. *Id.*, *reprinted in Social Security Reporting Service: Rulings 1975-1982*, at 793, 793 (West Publ'g Co. 1983); *see also Preston v. Heckler*, 769 F.2d 988, 990 (4th Cir. 1985) (holding that, if noncompliance is to be relied upon, the Commissioner must establish "that the claimant's impairment 'is reasonably remediable by the particular individual involved, given ... her social or psychological situation'").

[11] Although the record reveals that Plaintiff did undergo injections to treat his pain, there is no recording of the injections, and thus no showing whether the Plaintiff had separate appointments for these injections.

because they had carts he could drive, Tr. 29. And when he cooked, it was only to prepare "[r]eally simple things" while standing for a few minutes on one foot. Tr. 28. The performance of such activities which, by their nature, "provide[] the type of flexibility to alternate standing, sitting and walking, and to rest . . . when necessary," simply does not provide a basis to find Plaintiff not credible. *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000); *see also Totten v. Califano*, 624 F.2d 10, 11 (4th Cir. 1980) ("An individual does not have to be totally helpless or bedridden in order to be found disabled under the [Act.]"); *cf.* SSR 96-8p, 61 Fed. Reg. 34,474, 34,475 (requiring the ALJ to discuss the RFC finding within the context of performing "sustained work activities in an ordinary work setting on a regular and continuing basis").

"An ALJ's assessment of a claimant's credibility regarding the severity of pain is entitled to great weight," *Kearse v. Massanari*, 73 F. App'x 601, 603 (4th Cir. 2003) (citing *Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984)), but this is not an absolute rule, *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993), and will not be upheld when "premised on flawed logic," *Indoranto v. Barnhart*, 374 F.3d 470, 475 (7th Cir. 2004). Because the ALJ's credibility assessment is flawed, it cannot be upheld. On remand, if it becomes necessary that the ALJ consider Plaintiff's credibility, he should re-evaluate his findings in accordance with this Report.

### 3. RFC

Finally, Plaintiff asserts that the ALJ erred in his RFC assessment. If, at step three of the sequential evaluation, the factfinder does not find that a claimant's impairment meets or equals a Listing, she must make an RFC finding "based on all the relevant medical and other evidence in [the] case record." 20 C.F.R. § 404.1520(e). The fact-finder performs the RFC

assessment because the Administration recognizes that a claimant's impairments, together with related symptoms, may cause limitations that affect work capacity.  *Id.* § 404.1545(a)(1).  "RFC is the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs."  SSR 83-10, *reprinted in West's Social Security Reporting Service: Rulings 1983-1991*, at 24, 30 (West Publ'g Co. 1992).

Because the court recommends the ALJ be required to reconsider record evidence on remand in determining whether Plaintiff meets or medically equals a Listed impairment, the court declines to fully discuss Plaintiff's claim that the RFC is flawed. *See* 20 C.F.R. § 404.1520(a)(4) (noting that, if Commissioner can find claimant disabled or not disabled at a step, the Commissioner makes that determination and does not go on with the analysis). In the event the ALJ again considers Plaintiff's RFC, he should also consider Plaintiff's objections to his prior RFC finding and should consider the RFC in light of this Report.

III. Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law.  Based on the foregoing, the undersigned cannot determine that the Commissioner's finding is supported by substantial evidence or is without legal error.

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions, it is recommended that the Commissioner's decision be reversed and remanded under sentence six of 42 U.S.C. § 405(g).  The Commissioner should be directed to remand the matter to the ALJ for proceedings consistent with this recommendation.

IT IS SO RECOMMENDED.

July 10, 2012
Florence, South Carolina

Kaymani D. West
United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**